**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Silas McDaniel*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SILAS MCDANIEL, derivatively on behalf of KYVERNA THERAPEUTICS, INC., | Case No. 3:25-cv-4393 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| BETH SEIDENBERG, FRED E. COHEN, STEVE LIAPIS, DANIEL K. SPIEGELMAN, IAN CLARK, RYAN JONES, BRIAN KOTZIN, DOMINIC BORIE, JAMES CHUNG, PETER MAAG, and KAREN WALKER, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| KYVERNA THERAPEUTICS, INC, | |
| Nominal Defendant. | |

Plaintiff Silas McDaniel ("Plaintiff"), by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint, for the benefit of Nominal Defendant Kyverna Therapeutics, Inc. ("Kyverna" or the "Company"), against current and former members of the

1

Company's Board of Directors (the "Board") and certain of its executive officers, namely Beth Seidenberg ("Seidenberg"), Fred E. Cohen ("Cohen"), Steve Liapis ("Liapis"), Daniel K. Spiegelman ("Spiegelman"), Ian Clark ("Clark"), Peter Maag ("Maag"), Brian Kotzin ("Kotzin"), Ryan Jones ("Jones"), Dominic Borie ("Borie"), Karen Walker ("Walker"), and James Chung ("Chung") (collectively, the "Individual Defendants" and with Kyverna, "Defendants), to remedy the Individual Defendants' breaches of fiduciary duties and violations of federal law as contained herein.

Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, based on the investigation of Plaintiff's counsel, including a review of publicly available information, filings by Kyverna with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants between, at least, January 16, 2024 and June 14, 2024, both dates inclusive (the "Relevant Period").

2.     Kyverna is a clinical-stage biopharmaceutical company that develops cell therapies for autoimmune diseases. The Company specializes in CD19 chimeric antigen receptor ("CAR") T-cell therapy, a type of immunotherapy that utilizes a patient's own genetically modified T cells to target CD19 proteins on the surface of malignant B cells.

3.     Kyverna's lead product candidate is KYV-101, a CAR T-cell therapy with potential applications in the treatment of lupus nephritis ("LN"), a kidney disorder that commonly develops as a complication of systemic lupus erythematosus ("SLE" or "lupus").

4.     Kyverna launched two clinical trials of KYV-101, KYSA-1 (NCT05938725) and KYSA-3 (NCT06342960), to assess, *inter alia*, adverse events and laboratory abnormalities, the

frequency of dose-limiting toxicities, efficacy, and immunogenicity (the ability of a substance to induce an immune response in the body).

5. Throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements, failing to disclose adverse data related to one of the clinical trials for KYV-101 until June 14, 2024, when the Company published an investor presentation revealing the negative results.

6. As a consequence of the revelations, the price of Kyverna stock declined approximately 34%, from a close of $14.44 per share on June 13, 2024 to a close of $9.53 per share on June 14, 2024.

7. As a result of the foregoing, a securities class action was filed in this Court against Kyverna and certain of its Board members and executive officers, styled as *Rondini v. Kyverna Therapeutics, Inc., et al.*, Case No. 5:24-cv-08869-PCP (N.D. Cal.) (the "Securities Class Action").

8. In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors of Kyverna, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and the nature of the Individual Defendants' longstanding business and personal relationships with one another, the Individual Defendants cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. As such, Plaintiff did not make a demand on the Board.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(f), and Section 11(f) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k(f)(1). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act.

3

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Kyverna is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

13.     Plaintiff is a current shareholder of Kyverna and has continuously held Kyverna stock at all relevant times.

14.     Nominal Defendant Kyverna is incorporated under the laws of Delaware with its primary executive officers located at 5980 Horton Street, Suite 550, Emeryville, California 94608. Kyverna's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "KYTX."

15.     Defendant Seidenberg has served as a member of the Board since September 2018. As of March 15, 2025, Defendant Seidenberg beneficially owned 4,534,912 shares of common stock, making up 10.5% of the Company's total outstanding stock. Defendant Seidenberg is a defendant in the Securities Class Action.

16.     Defendant Cohen has served as a member of the Board since September 2018. As of March 15, 2025, Defendant Cohen beneficially owned 4,534,912 shares of Kyverna common stock, making up 10.5% of the Company's total outstanding stock. Defendant Cohen is a defendant in the Securities Class Action.

17.     Defendant Liapis has served as a member of the Board since November 2022. Defendant Liapis serves as a member of the Audit Committee. Defendant Liapis is a defendant in the Securities Class Action.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

18.     Defendant Spiegelman has served as a member of the Board since April 2021. Defendant Spiegelman serves as Chairperson of the Audit Committee. As of March 15, 2024, Defendant Spiegelman beneficially owned 28,566 shares of Kyverna common stock. Defendant Spiegelman is a defendant in the Securities Class Action.

19.     Defendant Clark has served as Chairperson of the Board since September 2021. As of March 15, 2024, Defendant Clark beneficially owner 285,951 shares of Kyverna common stock. Defendant Clark is a defendant in the Securities Class Action.

20.     Defendant Jones has served as the Company's Chief Financial Officer ("CFO") since January 2023. Defendant Jones is a defendant in the Securities Class Action.

21.     Defendant Kotzin served as a member of the Board from August 2019 until September 2024. Defendant Kotzin is a defendant in the Securities Class Action.

22.     Defendant Borie served as the Company's CEO from December 2019 until May 2022 and as President, Research and Development, from May 2022 until January 2025. Since January 2025, Defendant Borie has served as a strategic advisor to the CEO. According to the Company's public filings, Defendant Borie received $587,840 in compensation from the Company in 2024. As of March 15, 2025, Defendant Borie beneficially owned 510,013 shares of Kyverna common stock, making up 1.2% of the Company's total outstanding stock. Defendant Borie is a defendant in the Securities Class Action.

23.     Defendant Chung served as the Company's Chief Medical Officer from March 2021 until November 2024. According to the Company's public filings, Defendant Chung received $624,576 in compensation from the Company in 2024. As of March 15, 2025, Defendant Chung beneficially owned 65,918 shares of Kyverna common stock. Defendant Chung is a defendant in the Securities Class Action.

24.     Defendant Maag served as the Company's Chief Executive Officer ("CEO") and as a member of the Board from October 2022 until September 2024. According to the Company's public filings, Defendant Maag received $1,481,230 in compensation from the Company in 2024. As of March 15, 2025, Defendant Maag beneficially owned 1,012,787 shares of Kyverna common

stock, making up 2.3% of the Company's total outstanding stock. Defendant Maag is a defendant in the Securities Class Action.

25.     Defendant Walker has served as the Company's Chief Technology Officer since July 2021. According to the Company's public filings, Defendant Walker received $591,360 in compensation from the Company in 2024. As of March 15, 2025, Defendant Walker beneficially owned 121,722 shares of Kyverna common stock. Defendant Walker is a defendant in the Securities Class Action.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers, directors, and/or fiduciaries of Kyverna and because of their ability to control the business and corporate affairs of Kyverna, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

27.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

28.     As officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and

directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

30. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Kyverna's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Kyverna conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Kyverna and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Kyverna's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

31.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

32.    Each of the Individual Defendants owed to Kyverna and the shareholders the duty of loyalty requiring that each favor Kyverna's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

33.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Kyverna.

34.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Kyverna and at all times acted within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

37.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, to fail to correct such misrepresentations, and to violate applicable laws.

38.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board and the Company's senior management, each of the Individual Defendants, who are directors or officers of Kyverna, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

39.     In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing. As such, each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

40.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Kyverna and at all times acted within the course and scope of such agency.

## CODE OF CONDUCT

41.     The Code of Conduct states a commitment to "maintaining the highest standards of business conduct and ethics" and applies to "every employee, officer and director" of the Company.

42.     Violations of the Code of Conduct may lead to "disciplinary action, which, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand to and including termination of employment and, in appropriate cases civil legal action or referral for regulatory or criminal prosecution."

43.     In a section titled "Honest and Ethical Conduct," the Code of Conduct states that "[i]t is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us."

44.     In a section titled "Legal Compliance; Lawsuits and Legal Proceedings," the Code of Conduct states, in pertinent part:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, regional, national and international authorities (as further described in Section 6). We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility including, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. In particular, the research and development of pharmaceutical products is subject to a number of legal and regulatory requirements, including standards related to ethical research procedures, such as regarding animal welfare and human subjects protection, proper scientific conduct and data integrity. We are committed to conducting research and development activities ethically, at the highest scientific standards, and in compliance with all applicable regulatory requirements. We expect employees to comply with all such requirements.
>
> * * *
>
> Disregard of the law will not be tolerated. Violation of laws, rules and regulations may subject an individual, as well as the Company, to civil and/or

10

criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

45.    In a section titled "Conflicts of Interest," the Code of Conduct states, in pertinent part:

We respect the rights of our employees to manage their personal affairs and investments and do not wish to intrude upon their personal lives. At the same time, employees should avoid actual or potential conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of the Company. A conflicting personal interest could result from an expectation of personal benefit or gain (for you or a family member) now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect our employees to be free from influences that conflict with the best interests of the Company or might deprive the Company of their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Whether or not a conflict of interest exists or will exist can be unclear.

46.    In a section titled "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," the Code of Conduct states:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results, clinical trial or pre-clinical study results or otherwise, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, partners, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other application laws, rules and regulations;

- all employees must cooperate fully with our finance and accounting personnel, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete;

- no employee, director or person acting under their direction, may coerce, manipulate, mislead or fraudulently influence our finance and accounting personnel, our independent public accountants or counsel; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report the employee's knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee or one of the other compliance resources described in Section 24 or in accordance with the provisions of the Company's Open Door Policy for Reporting Violations and Complaints.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

47.     In a section titled "Fair Dealing," the Code of Conduct states, in pertinent part:

We strive to outperform our competition fairly and honestly. Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical or illegal business practices.

* * *

You are expected to deal fairly with our customers, suppliers, partners, employees and anyone else with whom you have contact in the course of performing your job. Be aware that the Federal Trade Commission Act provides that "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." It is a violation of the Federal Trade Commission Act to engage in deceptive, unfair or unethical practices and to make misrepresentations in connection with sales activities.

48.     In a section titled "Protection and Proper Use of Company Assets," the Code of Conduct states, in pertinent part, that "[a]ll employees are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our financial condition and result of operations."

49.     In a section titled "Media/Public Discussions," the Code of Conduct states, in pertinent part:

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media, on social media and in the investment community directly impacts our reputation, positively or negatively. We are committed to ensuring that the Company's communications are truthful, meaningful, consistent and in compliance with all laws.

## AUDIT COMMITTEE CHARTER

50.     Pursuant to Kyverna's Audit Committee Charter, the purposes of the Audit Committee are to:

- oversee the accounting and financial reporting processes and the systems of internal control over financial reporting of the Company and the audits, quality and integrity of the Company's financial statements and reports;

- take, or recommend that the Board of Directors of the Company (the "Board") take, appropriate action to oversee the qualifications, independence and performance of the independent registered public

13

accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attest services (the "Auditors");

- prepare and review the audit committee report or other disclosures required by the rules of the Securities and Exchange Commission (the "SEC") to be included in each annual meeting proxy statement and periodic reports of the Company in accordance with applicable SEC rules and regulations;

- provide oversight assistance in connection with the Company's legal, regulatory and ethical compliance programs pertaining to financial, accounting and tax matters as established by management and the Board; and

- provide oversight regarding the Company's policies with respect to risk assessment and risk management, including enterprise risk and risks pertaining to the financial, accounting and tax matters of the Company.

51.    The Audit Committee's responsibilities, per the Audit Committee Charter, are:

- ***Audited Financial Statement Review.***  To review and discuss with management and the Auditors, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC, and to recommend whether or not such financial statements should be so included. Further, auditing literature, particularly Statement on Auditing Standards No. 100 (AU Section 722), defines the term "review" to include a particular set of required procedures to be undertaken by independent auditors. The members of the Committee are not independent auditors, and the term "review" as used in this Charter is not intended to have that meaning and should not be interpreted to suggest that the Committee members can or should follow the procedures required of auditors performing reviews of financial statements.

- ***Annual Audit Results.*** To review and discuss with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of the Company's accounting principles and practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates), all known and likely misstatements identified during the audit, including any material audit adjustments proposed by the Auditors and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under generally accepted

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

accounting standards, including the standards of the PCAOB, as appropriate.

\* \* \*

- **Quarterly Results.** To review and discuss with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Reports on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under generally accepted accounting standards, including the standards of the PCAOB.

- **Management's Discussion and Analysis.** To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

- **Press Releases.** To review and discuss with management and the Auditors, as appropriate, earnings press releases and press releases containing other financial information or results of operations, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chairperson may represent the entire Committee for purposes of this discussion. To the extent practicable, the Committee shall be furnished with an advance copy of each earnings release for its review prior to publication.

- **Accounting Principles and Policies.** To review and discuss with management and the Auditors, as appropriate, significant issues and changes that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices to be used in the audit, alternative accounting policies and treatments of financial information available under generally accepted accounting principles in the United States ("GAAP") related to material items discussed with management, the potential impact on the Company's financial statements of the use of such alternative accounting policies and treatments (including off-balance sheet transactions, arrangements, structures and obligations), other material written communications between the Auditors and management and any other significant reporting issues and judgments, significant regulatory, legal and accounting

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

initiatives and developments that may have a material impact on the Company's financial statements, compliance programs or policies.

- ***Risk Assessment and Management.*** To assist the Board in overseeing the risk management of the Company, and to review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to enterprise, financial and legal risk assessment, risk exposures and risk management, and other risks as the Company deems necessary or appropriate from time to time, including financial, accounting, operational, tax, privacy, cybersecurity, competition, legislative and regulatory developments, intellectual property, technology and facilities obsolescence, business continuity and natural and man-made disasters. The Committee shall also oversee the steps management has taken to monitor or mitigate such exposures, including periodically reviewing the Company's risk management framework, procedures and any related policies with respect to risk assessment and risk management.

\* \* \*

- ***Internal Control Over Financial Reporting.*** To confer with management and the Auditors, as appropriate, regarding the scope, design, implementation, adequacy and effectiveness of internal control over financial reporting, including any special audit steps taken in the event of material control deficiencies. To review with management and the Auditors any fraud, whether or not material, that includes management or other employees who have any significant role in the Company's internal control over financial reporting and any significant changes in internal controls or other factors that could significantly affect internal controls, including any corrective actions in regard to significant deficiencies or material weaknesses. To review and recommend action relating to any report from the Auditors made pursuant to Section 10A of the Exchange Act of illegal acts which it believes are likely to have occurred and which would have an effect on the Company's financial statements, including any contingent monetary effects, such as fines, penalties and damages.

- ***Disclosure Controls and Procedures.*** To review and discuss with management and the Auditors, as appropriate, the adequacy and effectiveness of the Company's disclosure controls and procedures.

\* \* \*

- ***Legal Matters and Correspondence with Regulators.*** To consider and review with management, the Auditors, outside counsel, as appropriate, and, in the judgment of the Committee, such special counsel, separate accounting firm and other consultants and advisors as the Committee

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

deems appropriate, any legal or regulatory matters, correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies. The Committee will also periodically review the Company's procedures for detecting fraud.

* * *

- **_Ethical Compliance; Related Party Transactions; Code of Business Conduct and Ethics._** To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws, regulations and rules, as well as to its Code of Business Conduct and Ethics, including review and oversight of related party transactions as required by Nasdaq and SEC rules (including without limitation those defined in Item 404 of Regulation S-K, but excluding any compensation-related matters), and to approve any waivers of the Code of Business Conduct and Ethics for an executive officer or director. The Committee shall administer the Company's policies regarding the review and approval of such transactions, if and as appropriate. The Committee will also periodically review and assess the adequacy of the Code of Business Conduct and Ethics and, as appropriate, recommend any proposed changes to the Board for its consideration and approval.

* * *

- **_Report to Board._** To, through the Chairperson, report to the Board with respect to all material activities of the Committee and all material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the Auditors, the performance of the Company's internal audit function, if any, or such other matters as the Committee deems appropriate or advisable to report to the Board from time to time or whenever so requested by the Board.

- **_Committee Self-Assessment_**. To review, discuss, and assess the Committee's own performance and composition at least annually.

- **_Internal Audit._** To the extent that the Company has an internal audit function, to oversee and evaluate (i) the performance, responsibilities, budget and staffing of the Company's internal audit function and the performance of the Company's internal auditor(s), if any, or others responsible for the internal audit function, including, but not limited to, contracted non-employee or audit or accounting firms engaged to provide internal audit services, if any, and (ii) the internal audit plan, including

17

review of any process of appointment and/or replacement of the senior employee(s) in charge of the internal audit function.

## SUBSTANTIVE ALLEGATIONS

### Background

52.    Kyverna is a clinical-stage biopharmaceutical company focused on the development of cell therapies for autoimmune diseases. The Company specializes in CAR T-cell therapy, a type of immunotherapy that utilizes a patient's own genetically modified T cells to target CD19 proteins on the surface of malignant B cells.

53.    The Company's lead product candidate is KYV-101, a CAR T-cell therapy with potential applications in the treatment of LN, a kidney disorder that commonly develops as a complication of lupus.

54.    Kyverna launched two clinical trials of KYV-101: (i) KYSA-1 (NCT05938725); and (ii) KYSA-3 (NCT06342960). These clinical trials were designed to assess, *inter alia*, the incidence of adverse events and laboratory abnormalities, the frequency of dose-limiting toxicities, efficacy, and immunogenicity.

### Clinical Trials for KYV-101

55.    LN involves the immune system mistakenly attacking the kidneys, leading to inflammation of the kidneys, or renal inflammation, and potential kidney damage.

56.    LN disease activity can be measured by urine and blood tests that detect indicators of immune activation and renal inflammation. The tests typically measure the following: (i) Urinary Protein-Creatinine Ratio ("UPCR"); (ii) anti-dsDNA levels, antibodies associated with LN; and (iii) levels of C3 and C4 complement proteins, which play a critical role in the immune system's defense against infection.

57.    Measuring UPCR is crucial because elevated levels of protein in the urine are a significant indicator of LN disease. As the Offering Documents explained:

[P]roteinuria, [i.e.] elevated levels of protein released in urine, serves as a biological marker of LN disease activity and potential renal damage, and provides a more objective clinical endpoint through which we can measure the potential clinical benefits of KYV-101. . . . Resolution of proteinuria,

18

measured through UPCR, is therefore used as a key component in the quantitative and objective composite endpoint, CRR [Complete Renal Response], which we use as an endpoint for KYSA- 1 and KYSA-3. CRR has been accepted as a registration-enabling endpoint for LN clinical trials.

58.     A UPCR of 0.5 or higher is the generally-accepted threshold for a diagnosis of LN. Anti-dsDNA antibody levels are measured in IU/mL (international units per milliliter), and higher levels correlate with greater LN disease activity.

59.     Anti-dsDNA levels in excess of 200 IU/mL are strongly indicative of active disease activity.

60.     With respect to C3 and C4 complement proteins, low protein levels are a strong indicator of SLE. Specifically, C3 levels below 80 mg/dL (milligrams per deciliter) and C4 levels below 15 mg/dL are associated with LN disease.

61.     These indicators are typically measured in patients undergoing treatment for LN to monitor the efficacy of the treatment. In clinical trials for LN, a successful treatment involves a Complete Renal Response ("CRR"), which is typically defined by a UPCR below 0.5, stable or improved renal function, and no use of immunosuppressive therapy at a specified point in time following treatment. As explained in the Offering Documents, "CRR has been accepted as a registration-enabling endpoint for LN clinical trials" and was used by the Company "as an endpoint for KYSA-1 and KYSA-3." According to the clinical trial registration record for the KYSA-1 trial, the timeframe for assessing CRR in a patient was up to 52 weeks.

**Kyverna's Public Offering**

62.     On January 16, 2024 and February 8, 2024, respectively, Kyverna filed a Registration Statement and Prospectus with the SEC (the "Offering Documents") in connection with an upcoming initial public offering ("IPO").

63.     On or about February 8, 2024, pursuant to the Offering Documents, Kyverna went public via IPO, offering 14.5 million shares of its common stock to the public at a price of $22 per share for expected proceeds of over $296 million.

64.     At the time of the IPO, both clinical trials evaluating KYS-101 were underway. As a sponsor of both trials, Kyverna was monitoring results from the trials on an ongoing basis.

**Materially False and Misleading Statements**

65.    According to the Offering Documents, "[i]n the early results available as of December 31, 2023, from the first two adult patients enrolled in our KYSA-1 LN trial and from the first adult patient enrolled in our KYSA-3 LN trial, we observed improvement in" UPCR, can detect certain indicators of lupus and provides information about kidney function.

66.    The Offering Documents reported that the first clinical trial patient, who was enrolled in the KYSA-1 LN trial, had been dosed in July 2023.

67.    The Offering Documents further reported that "[t]he primary endpoints for the KYSA-1 trial are the incidence of adverse events and laboratory abnormalities and the frequency of dose-limiting toxicities," and that "[s]econdary endpoints of KYSA-1 include characterizing pharmacokinetics and pharmacodynamics, evaluating disease- related biomarkers, evaluating efficacy including Complete Renal Response, or CRR, and time to CRR, and evaluating immunogenicity."



68.    The Offering Documents included the following charts, which purported to reflect UPCR, anti-dsDNA levels, and C3 and C4 levels over time for the two patients evaluated in the KYSA-1 trial, identified as "KYSA-1 Pt #1" and "KYSA-1 Pt #2



21

69.     As reflected in the above charts, which showed decreases in UPCR and anti-dsDNA levels and increases in C3 and C4 levels, the Offering Documents further reported "observed improvement in UPCR" for all three of the clinical trial patients who were treated with KYV-101.

70.     With respect to Patient 1, whose results were reflected in the black lines on the above charts, the Offering Documents reported that "[a]fter KYV-101 treatment therapy, patient 1 discontinued immunosuppressive therapy except 10 mg [milligrams] prednisone, which was discontinued on day 31" and that Patient 1's "UPCR improved from 1.5 at baseline to 0.5 by day 56 and improved to below 0.5 by day 120 without glucocorticoids or immunosuppressive therapy."

71.     The Offering Documents additionally stated that Patient 1's C3 and C4 levels on Day 0 were reported at 55 mg/dL and 14 mg/dL and that by Day 140, Patient 1's C3 level and C4 levels were 85 mg/dL and 25 mg/dL, respectively.

72.     Importantly, Patient 1's reported C3 and C4 levels after treatment with KYS-101 were above the threshold typically associated with LN disease activity.

73.     Similarly, as demonstrated in the above charts, Patient 1's anti-dsDNA level decreased from 300 IU on Day 0 to 115 IU by Day 120 and appeared to be following a steep downward trajectory, signaling that anti-dsDNA levels would continue to decrease as additional data was made available.

74.     Reflected by the green line in the above charts, the Offering Documents stated, with respect to Patient 2, that "UPCR improved from 3.4 at baseline to 0.6 by around day 30," and reported a decrease in anti-dsDNA levels and increases in C3 and C4 complement levels. The Offering Documents reported Patient 2's UPCR through about 67 days after treatment and reported a decrease to just above 0.5 by that time. UPCR was the only indicator not reported for Patient 2 through at least roughly 95 days.

75.    On March 26, 2024, Kyverna filed an annual report on Form 10-K with the SEC (the "2023 10-K"), which was signed by Defendants Maag, Jones, Clark, Cohen, Kotzin, Liapis, Seidenberg, and Spiegelman.

76.    The 2023 10-K touted the prospects of its lead drug candidate, stating that, "[b]ased on our initial product candidate KYV-101 and on our emerging research efforts, it is our ambition to become the leader in the development of cell therapies for the treatment of immune diseases."

77.    With respect to the clinical trials for KYV-101, the 2023 10-K stated:

> Our lead program, KYV-101, is an autologous CD19 CAR T-cell product candidate made from an underlying chimeric antigen receptor, or CAR, that we have licensed from the National Institutes of Health, or the NIH. This underlying CAR in KYV- 101 has completed a 20-patient Phase 1 trial in oncology conducted by the NIH, and the results from this Phase 1 trial published in *Nature Medicine* reported improved tolerability in the clinic among adult oncology patients using the same CAR construct in KYV-101, as compared to the CAR used to create Yescarta®.

78.    The statements identified above were materially false and misleading and omitted to state material adverse facts known by the Individual Defendants at the time of their issuance. Specifically, the statements identified above failed to disclose that: (i) the KYSA-1 trial had actually shown significantly increased LN activity for Patient 1 despite initial improvement; and (ii) Patient 1 experienced a relapse of LN.

79.    Given the small sample size of only three patients evaluated in the clinical trials, adverse data pertaining to any one of these patients would be of significant investor concern.

**The Truth Emerges**

80.    On June 14, 2024 in Vienna, Kyverna hosted an industry symposium at the European Alliance of Associations for Rheumatology ("EULAR") during which the Company provided an updated on KYV-101.

81.    Specifically, Defendant Chung stated:

> You can see that in patient one, who received half of the target dose and received 50 million cells, had initially a very good response, with the ability to discontinue

the immunosuppressants. She was on 10 mg of prednisone and discontinued that on day 31. ***But unfortunately, by between months five and six, [Patient 1's] disease recurred, and she was placed back on immunosuppressants.***

[Emphasis added].

82.    Patient 1 was dosed in July 2023. Accordingly, the relapse must have occurred between December 2023 and January 2024, prior to the IPO.

83.    That same day, Kyverna published an investor presentation that disclosed adverse data regarding one of its clinical trials. The investor presentation included graphs depicting Patient 1's anti-dsDNA levels and C3 and C4 complement levels up to 265 days after treatment.

84.    These charts demonstrated Patient 1's worsening condition between the last day for which data was reported in the Offering Documents and the last datapoints that had actually been available as of the IPO, reflected in the highlighted portions:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT





VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

85. These charts demonstrate that Patient 1's anti-dsDNA levels significantly increased between Day 120, the last day reported in the Offering Documents, and the day of the IPO. Indeed, by the date of the IPO, Patient 1's anti-dsDNA levels had risen to over 250 IU/mL, or more than twice the most recent level reported in the Offering Documents.

86. Moreover, Patient 1's C3 and C4 levels significantly decreased between day 140, the last day reported in the Offering Documents, and the day of the IPO. Indeed, by the date of the IPO, Patient 1's C3 and C4 levels had decreased to 45 mg/dL and 10 mg/dL, respectively.

87. Importantly, Patient 1's C3 and C4 levels not only reflected significant LN disease activity but had actually declined to a level that was worse than Patient 1's C3 and C4 levels prior to treatment.

88. During the conference, Kyverna further disclosed that Patient 2's UPCR had increased from 0.5 on Day 67 to just above 2.5 roughly 95 days after treatment, as shown by the pink-shaded line in the chart below:



VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

89. The charts produced in the Offering Documents contained other data for Day 95, meaning that data as of that date was available well before the IPO. However, the data showing this significant increase in Patient 2's UPCR levels was omitted from the Offering Documents.

90. As a result of these disclosures, the price of Kyverna stock declined approximately 34%, from a close of $14.44 per share on June 13, 2024 to a close of $9.53 per share on June 14, 2024.

91. Since June 14, 2024, the price of Kyverna stock has continued to decline precipitously.

## DAMAGE TO KYVERNA

92. As a direct and proximate result of the Individual Defendants' misconduct as alleged herein, Kyverna has expended and will continue to expend significant sums of money.

93. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Kyverna. Such expenditures also include the costs of remediating deficiencies in the Company's procedures and controls.

94. As a direct and proximate result of the Individual Defendants' conduct, Kyverna has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties. The credibility and motives of management are now in serious doubt.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95. Plaintiff brings this action derivatively in the right of and for the benefit of Kyverna to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and violations of federal law as alleged herein.

96.     Kyverna is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

97.     Plaintiff is an owner of Kyverna stock and has been a continuous shareholder of Company stock at all relevant times. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

98.     At the time this suit was filed, the Board consisted of Defendants Seidenberg, Cohen, Liapis, Spiegelman, and Clark and non-parties Warner Biddle, Christi Shaw, and Mert Aktar (the "Director Defendants"). Plaintiff is required to show that a majority, i.e. four, Directors cannot exercise independent objective judgment about whether to bring this action.

99.     Plaintiff did not make a demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below, because at least five of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

100.    Each of the Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy the situation.

101.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

102.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

103.    The Director Defendants are not disinterested or independent because each of the Director Defendants is named as a defendant, and faces significant personal liability, in the

Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

104.    The acts complained of herein constitute violations of fiduciary duties owed by Kyverna's officers and directors, and these acts are incapable of ratification.

105.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

106.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Importantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein. The Director Defendants have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

107.    Defendants Spiegelman and Liapis serve on the Company's Audit Committee (the "Audit Defendants"). Pursuant to the Audit Committee Charter, the Audit Defendants were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, the audits of the financial statements, and oversight with respect to the Company's risk management function and its legal and regulatory compliance. At all relevant times, however, the Audit Defendants breached their fiduciary duty

to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding results from clinical trials of KYV-101 and the adequacy of the Company's internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

108. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

109. The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Kyverna. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Kyverna, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused. If there is no directors' and officers' liability insurance, then the directors will not cause Kyverna to sue the Defendants named herein, since, if they did, they would face a large

uninsured individual liability. Accordingly, demand is futile in that event as well.

110.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, therefore, excused.

### CLAIM I

### *Against the Individual Defendants for Breach of Fiduciary Duties*

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.    Each Individual Defendant owed to Kyverna the fiduciary duty to exercise candor, good faith, fair dealing, and loyalty in the management and administration of Kyverna's business and affairs, particularly with respect to issues as fundamental as public disclosures.

113.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

114.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall business, operations, and prospects. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to disclose such facts, even though such facts were available to them. As such, the Individual Defendants' intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Kyverna.

115.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

116.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Kyverna has sustained and continues to sustain significant monetary damages as well as reputational harm and damage to the share price of the Company's stock. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

117.   Plaintiff, on behalf of Kyverna, has no adequate remedy at law.

## CLAIM II

### *Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty*

118.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have encouraged, facilitated, and advanced their breach of their fiduciary duties.

120.   In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the illegal conduct complained of herein.

121.   Plaintiff, on behalf of Kyverna, has no adequate remedy at law.

## CLAIM III

### *Against the Individual Defendants for Waste of Corporate Assets*

122.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

123.   By failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Kyverna to waste valuable corporate assets. Specifically, the Individual Defendants have caused Kyverna to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products. Moreover, the Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

124.   The issuance of false and misleading statements by the Individual Defendants was continuous, connected, and ongoing through the Relevant Period and resulted in continuous, connected, and ongoing harm to Kyverna.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

125.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

126.    Plaintiff, on behalf of Kyverna, has no adequate remedy at law.

## CLAIM IV

### *Against the Individual Defendants for Unjust Enrichment*

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Kyverna.

129.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Kyverna that was tied to the performance or artificially inflated valuation of Kyverna, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

130.    Plaintiff, as a shareholder and a representative of Kyverna, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

131.    Plaintiff, on behalf of Kyverna, has no adequate remedy at law.

## CLAIM V

### *Against the Individual Defendants for Contribution Under 21D of the Exchange Act and Section 11(f) of the Securities Act*

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

133.    As a result of the misconduct alleged above, Kyverna is named as a defendant and joint tortfeaser in the Securities Class Action, along with the Individual Defendants named herein, in claims brought under Sections 11, 12(a), and 15 of the Securities Act.

134.    Federal law provides Kyverna with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

135.    The plaintiff in the Securities Class Action alleges that the Offering Documents, filed with the SEC in connection with the Company's IPO, contained numerous untrue statements of material facts and omitted to state material facts necessary to make the statements not misleading.

136.    Kyverna is the registrant for the IPO, and the Individual Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

137.    As the issuer of the shares, Kyverna is strictly liable to the plaintiff in the Securities Class Action for the misstatements and omissions alleged therein.

138.    The plaintiff in the Securities Class Action alleges that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and not misleading.

139.    The Individual Defendants, because of their positions of control and authority as officers and directors of Kyverna, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Kyverna, including the wrongful acts complained of herein and in the Securities Class Action.

140.    Accordingly, the Individual Defendants are liable pursuant to Section 11(f) of the Securities Act, 15 U.S.C. § 77K(f)(1), which creates a private right of action for contribution.

141.    The Individual Defendants are also liable pursuant to Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

142.    As such, Kyverna is entitled to receive all appropriate contribution or indemnification from the Individual Defendants.

143.    Plaintiff, on behalf of Kyverna, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Kyverna and that Plaintiff is a proper and adequate representative of the Company;

B.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Kyverna;

C.    Against all of the Defendants and in favor of Kyverna for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

D.    Directing Kyverna to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Kyverna and its shareholders from a continuation or repetition of the damaging events described herein;

E.    Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

F.    Awarding Kyverna restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants, including profits obtained by insider sales;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: May 22, 2025                    Respectfully submitted,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Silas McDaniel*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

I, Silas McDaniel am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this 5/19/2025

Silas McDaniel